**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MARIA De LOURDES BECERRIL    :
MERCADO,
                            :

      Plaintiff,
                            :

vs.                           CA 16-0373-MU
                            :

NANCY A. BERRYHILL,
Acting Commissioner of Social Security, :

      Defendant.


## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability, disability insurance benefits, and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 18 & 20 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of

counsel at the April 26, 2017 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

## I. Procedural Background

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on March 4, 2013 and April 1, 2013, respectively, alleging disability beginning on March 29, 2012. (*See* Tr. 244-51.) Her claims were initially denied on August 30, 2013 (Tr. 174-78) and, following Plaintiff's request for a hearing before an Administrative Law Judge (*see* Tr. 181-82), a hearing was conducted before an ALJ on December 4, 2014 (Tr. 61-109). On March 13, 2015, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to social security benefits. (Tr. 35-57.) More specifically, the ALJ went to the fourth step of the five-step sequential evaluation process and determined that Mercado is capable of performing past relevant work as an administrative clerk and a human resources clerk as she actually performed those jobs (*see* Tr. 55-56). On April 21, 2015, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 28) and, the Appeals Council denied Mercado's request for review on June 3, 2016 (Tr. 1-3). Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due to hypothyroidism, depression, obesity, and degenerative disc disease. In light of the issues raised by Plaintiff in her brief (*see* Doc.

---

[1]    Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 18 & 20 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

12, at 2), the Court replicates the essential residual functional capacity portions of the

ALJ's decision, as well as the past relevant work determination, as follows:

> **5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), which involves lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, sitting at least 6 hours in an 8 hour day, and standing and walking at least 6 hours in an 8 hour day, except she can perform only frequent handling bilaterally, occasionally climb stairs, perform no kneeling or crawling, and have only occasional contact with the public.**

> .      .      .

> The claimant's hypothyroidism, obesity and degenerative disc disease result in the limitation to perform light work with the additional limitations as described above. Light work[,] as defined in 20 CFR 404.1567(b) and 416.967(b)[,] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. If the claimant can do light work, the regulations also reflect that she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> The medical evidence of record documents that the claimant was seen at LSU Medical Center Clinics between January 12, 2011 and January 19, 2012. On January 12, 2011, she was noted to have a low TSH of 0.46 (reference range 0.50-5.00), a low free T4 of 0.57 (reference range 0.60-1.15) and a low vitamin D level of 10.3 (reference range 32.0-100.0). On February 4, 2011, she told her provider that she recently moved here from Puerto Rico. She had a thyroid sonogram on February 9, 2011, which showed no abnormality. Repeat labs in February 2011 and September 2011 also showed a low TSH and free T4, but a normal free T3. She underwent an MRI of the pituitary, which was negative for any pituitary microadenoma. Likewise, the MRI of the brain on September 21, 2011 was within normal limits. The claimant was started on Levothyroxine 50 mcg daily in September 2011. The claimant initially stated that she had not noticed any change in her symptoms of fatigue and weight gain since starting the Levothyroxine. However, in November 2011, it was noted that she was taking her medication with food. She was told to take it on an

empty stomach 1 hour prior to any meals or medications. Her free T4 was within normal limits at 0.70 on November 29, 2011. Her vitamin B12 level was normal at 342, but her vitamin D was low at 10.5.

The claimant's Levothyroxine was discontinued on December 1, 2011. However, on January 19, 2012, the claimant said her symptoms were now worse and she felt more fatigued [and] had gained weight since discontinuing the Levothyroxine. Her doctor noted, however, that her weight change was only two-tenths of a pound since her last visit. The physical exam on January 19, 2012 showed her neck was supple with no thyromegaly, no thyroid nodules, and no thyroid bruits. . . . Her doctor decided to recheck her TSH and free T4, as well as a total T4 and a free T3. She was started on Vitamin D supplementation twice a week for 6 weeks. The January 19, 2012 thyroid tests showed a low free T4 of 0.51 and a low TSH. Her vitamin D was also low at 15.3.

The claimant was treated by Dr. Salgado in Louisiana on June 1, 2012 for back pain and pain to her left shoulder and lower left leg. The claimant said Mobic and Flexeril had helped some, but had not completely relieved her pain. Dr. Salgado noted the claimant brought copies of her lumbar spine MRI that showed no abnormality. On physical exam, the claimant had no tenderness to palpation over the spine, normal range of motion of the lumbar spine and a negative SLR bilaterally. She had normal range of motion of all joints in the upper and lower extremities. Dr. Salgado assessed the claimant with backache and gave her Tramadol to take as needed for pain.

The claimant saw Dr. Kakazu on July 10, 2012 for prescription refills. She reported back symptoms and muscle aches, but no arthralgia, soft tissue swelling, muscle cramps, restless legs, muscle spasms, localized joint swelling or localized joint stiffness. She was not feeling tired. The physical exam was normal except tenderness to palpation was present in the back. She was assessed with hypertension, menopause, and midback pain and was given Naproxen, Metoprolol, Levothyroxine and Amlodipine.

She saw Dr. Salgado on September 7, 2012 for head and back pain. The claimant also said she had been feeling very fatigued and had difficulty sleeping and she needed refills of her thyroid medication. She said she had been taking Tylenol for headaches without relief. The claimant said she stopped taking Tramadol for pain because it caused dizziness. The physical exam showed tenderness to palpation over the lower spine and a positive SLR bilaterally. She was assessed with hypothyroidism, spinal ankylosis and hypertension. She was given a prescription of Levothyroid 60 mcg, with 3 refills. The labs showed her TSH was low at 0.106. Her T3 uptake was within normal limits at 29% and T4 was within normal limits at 7.0. She saw Dr. Kakazu on January 4, 2013 for lower back pain and said

she did not need refills of her medications. She also told Dr. Kakazu that she was walking 1-2 times per week for exercise. She was assessed with lower back pain, but no physical exam findings were noted. She was given Mobic to take as needed for pain.

The claimant was seen by Ms. Harris at the health department in Alabama on April 16, 2013, and reported she has high blood pressure, joint pain in the left leg, back symptoms and muscle spasms. She said she was taking Amlodipine, Lisinopril and Levothyroxine daily. She also said she was taking Mobic and Flexeril as needed, as well as Vistaril as needed for anxiety. The physical exam showed tenderness to palpation and muscle spasm in the back, but no costovertebral angle (CVA) tenderness. Ms. Harris assessed her with hypertension, hyperthyroidism and backache. She returned to the health department on April 30, 2013 for lab results. The labs showed a low TSH of 0.102 and a free T4 that was within normal limits at 1.08. She denied palpations, shortness of breath, chest pain, abdominal pain or dizziness. She complained of recurrent low back pain that is worse in the morning. She was not feeling tired or poorly and reported no headaches. She rated her pain a 2/10 on the pain scale (0=no pain, 10=worst possible pain), but no abnormalities were noted on exam. She was assessed with hypertension, obesity and depression with anxiety. Ms. Harris decreased her Synthroid from 50 mcg to 25 mcg and started her on Zoloft. She also decreased her Norvasc from 10 mg to 5 mg because her blood pressure was 100/88.

During the consultative exam with Dr. Ozment on July 27, 2013, he noted the claimant was identified by her Louisiana driver's license, but she was driven to the clinic by a relative. The claimant's chief complaint related to her low back. The claimant reported that she has sharp pain that she rated a 10/10. She said there is no radiation of the pain. She said heat helps the pain and pain medications help a little bit. . . . She said she goes for a short walk when she gets up in the morning for about 15 minutes. The claimant reported that her current medications include Naproxen, Flexeril, Vistaril, Metoprolol, Norvasc and Levothyroxine.

Dr. Ozment noted the claimant walked to the exam room and appeared to sit comfortably. She could get on the exam table and sit down but she could not lie down on the table "because her back was hurting so bad." The claimant was 5'4" tall and weighed 199 pounds. He blood pressure was 110/70. . . . Her neck was supple without adenopathy, thyromegaly or masses. [Th]e claimant's lungs were clear to auscultation throughout. Her abdomen was soft, nontender and nondistended. Peripheral pulses were 2+ and equal bilaterally.

Dr. Ozment noted her station and gait were normal. She was poorly coordinated due to left back pain. She was unable to tandem walk, walk

on toes or heels, hop or squat. However, there was no assistive device. She was only able to forward flex her back with fingers extended to the level of about the knees. The Romberg was negative. The claimant had decreased range of motion in the lumbar spine, but range of motion was generally normal in the cervical region, knee joints, ankle joints and elbows/forearms. Dr. Ozment noted he was unable to adequately evaluate her hips because she could not lie down. She had decreased range of motion in the left shoulder with abduction to about 90 degrees, but she said that this was because her back was hurting. The seated SLR was positive in the back at about 15 degrees of lift in the left side of the back. She could not lie down, so the test was not performed in the supine position.

Dr. Ozment said the claimant could not abduct her shoulder above 90 degrees, but she said this was due to low back pain. Motor strength in the lower extremities was 5/5 on the right and 4/5 on the left. There was no evidence of localized tenderness, erythema or effusion. There was no evidence of diminution of function with repetition, spasticity or ataxia. Joint position and vibration sense were normal. Sensation to light touch and pinprick were grossly intact throughout the upper and lower extremities. Dr. Ozment diagnosed the claimant with low back pain on the left side with decreased range of motion of the lumbar spine probably secondary to degenerative disc disease, decreased range of motion of the left shoulder of uncertain cause, and positive SLR on the left.

The claimant saw Dr. Bond at the health department on November 22, 2013 for complaints of intermittent lower back pain. She rated her pain a 6/10. She also had been out of Synthroid for weeks and needed refills; but she did not report feeling tired or poorly. The physical exam showed a normal musculoskeletal system. No sensory exam abnormalities were noted and the motor exam demonstrated no dysfunction. No coordination/cerebellum abnormalities were noted and reflexes were normal. Dr. Bond assessed the claimant with hypothyroidism, backache and "no migraine headache." She was prescribed Levothyroxine, Tramadol to take as needed for pain and Robaxin to take as needed for muscle spasms.

On April 2, 2014, Dr. Teplick noted the claimant was seen primarily for stronger medication for her low back pain. The claimant said Tramadol was ineffective. Dr. Teplick noted the only drug stronger would be an opiate, which "would be inappropriate for chronic pain, although a pain clinic may prescribe one." She also reported having weakness of her left ankle for the last year with pain down the lateral side of the left leg to the ankle. She said she can walk for 15 minutes before having pain. She also reported having a frontal headache daily for 2 months lasting 2 hours if not treated, but resolved with Ibuprofen. The claimant reported that she had

lost 11 pounds over the last year. Her weight was 187 pounds at this visit. Dr. Teplick noted sternum tenderness on physical exam; but her back had no tenderness to palpation, no muscle spasms, and no CVA tenderness. The SLR was negative and the musculoskeletal exam was normal. A motor exam demonstrated no dysfunction and no lower extremity weakness. Dr. Teplick assessed the claimant with depression; hypertension, well controlled on low dose Amlodipine; hypothyroidism, thyroid function tests within normal limits on Synthroid with no symptoms; and backache with leg pain unlikely to be sciatica. He recommended a trial of 800 mg Ibuprofen and Amitriptyline.

The claimant saw Dr. Teplick on July 7, 2014, with continued low back pain. Dr. Teplick noted the pain was unchanged except instead of radiating down the leg to the ankle, it now radiates only to the top of her thigh. Dr. Teplick noted the x-rays were within normal limits. She had gained 12 pounds in the last 4 months. She reported occasional swelling in both feet for the last 2 months that is present in the morning, resolves during the day, and returns in the evening. She said her headaches were resolved. On physical exam, there was no sternum tenderness and no edema was present in the extremities. The back had tenderness to palpation mostly midline with no muscle spasms and no CVA tenderness. The SLR was negative. The motor exam demonstrated no dysfunction, and lower extremity strength was normal and equal. Dr. Teplick assessed the claimant with hypertension, apparently no need for even low dose Amlodipine; obesity; hypothyroidism, free T4 within normal limits with slightly low TSH on 50 mcg Levothyroxine; and backache, no radiculopathy, and lumbar spine x-ray within normal limits. He gave her a trial of Carisoprodol and Ibuprofen, and discussed the importance of weight loss and exercise.

The claimant was seen at the health department most recently of record by Robin Normand, CRNP, on August 29, 2014. She complained of weakness, dizziness and feeling very tired. The claimant was concerned about having some daytime drowsiness from her Amitriptyline that she was taking for back pain and sleep. The claimant rated her pain at this visit a 1/10. Her weight was 196, with a BMI of 34.7. She appeared to be in no acute distress. She was assessed with fatigue and depression with anxiety, as she told Ms. Normand that she was being treated for same at Altapointe. Ms. Normand restarted the claimant on Amlodipine for blood pressure, which was 122/87 when checked and planned to check her vitamin D level.

In terms of the claimant's hypothyroidism, treatment has been essentially routine and/or conservative in nature. The claimant's representative said this is the claimant's most prevalent condition, as it affects her energy level. Despite the fact that the claimant's TSH has remained slightly low

during the period at issue, the record does not document significant complications related to the thyroid condition. The claimant's weight has generally remained around 200 pounds during the period at issue, with the exception of an 11-pound weight loss over the last year as reported in April 2014. Additionally, her skin has generally been normal on exams and her speech has been normal. The physical exam on January 19, 2011 noted a goiter with the right side being larger than the left. However, no subsequent exams noted any thyroid-related abnormalities of the neck.

The claimant testified that she feels weak, tired and fatigued every day. However, many of her treatment notes reflect that she did not report these symptoms. Indeed, she often reported that she was not feeling tired or poorly. She also testified that she sleeps at night by taking medication to fall asleep, but her medication takes many hours to take affect and she only gets about 3 hours of deep sleep per night. However, Dr. Starkey's consultative exam report and the treatment notes from Altapointe reflect that the claimant improved sleep with the medications prescribed.

The claimant also testified that she has been having headaches for a long time, which started when she was placed on thyroid medication. The claimant said she talked to her doctor about the new onset of headaches, and he gave her other medications for headaches and back pain. The records in Exhibit B1F mention a diagnosis of migraine headaches, but Dr. Bond later specifically provided a diagnosis of "no migraine headaches" in November 2013. In addition, the record includes multiple office visits in which the claimant did not complain of headaches. She has not complained of ongoing shortness of breath, heart palpitations, and her blood pressure has remained within normal limits on medication. I have accounted for the claimant's hypothyroidism, as well as her documented complaints related to fatigue/weakness, dizziness, headaches, difficulty sleeping, etc. with the limitation to performing light work that includes only occasionally climbing stairs and performing no kneeling or crawling.

In terms of the claimant's degenerative disc disease, the record includes x-rays from September 23, 2011, which showed degenerative changes with disc space narrowing and moderate posterior and anterior vertebral spondylosis from C4 to C7 level and minor degenerative changes in the mid thoracic vertebrae. However, the claimant's complaints have generally involved only the lower back. The x-rays of the lumbosacral spine were normal in September 2011. Dr. Salgado also noted the claimant brought copies of her lumbar MRI to her June 2012 visit, and it showed no abnormalities. The x-rays of the lumbar spine on August 27, 2013, which showed minimal degenerative change at L5-S1. However, x-rays of the lumbar spine on November 22, 2013 were normal.

The physical exams have shown tenderness to palpation in the back and decreased range of lumbar spine at times. The claimant also had a positive SLR bilaterally in September 2012 and a positive SLR on the left in July 2013. I have taken the x-rays of the cervical, thoracic and lumbar spine into consideration, along with the physical exams as noted above into account in the residual functional capacity with the limitation to performing light work including lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, sitting at least 6 hours in an 8 hour day, standing and walking at least 6 hours in an 8 hour day, occasionally climbing stairs, and performing no kneeling or crawling. However, no greater limitation is warranted, as the other physical exams have shown no tenderness along the spine, no CVA tenderness, normal range of motion of the lumbar spine, no muscle spasms and a negative SLR bilaterally. Furthermore, the neurologic exams have shown no focal deficits, no sensory abnormalities and no motor dysfunction.

The claimant has also complained of left shoulder and left leg pain, as noted in June 2012, April 2013 and April 2014. The only physical exam finding that showed abnormality in the left shoulder was when Dr. Ozment said she had decreased range of motion and 4/5 motor strength in the left upper extremity. However, Dr. Ozment noted the claimant said this was because her back was hurting.  Dr. Ozment also noted she had 4/5 motor strength in the left lower extremity; however, her treating providers have noted no lower extremity weakness. Dr. Ozment also said she was poorly coordinated due to left back pain. However, she has generally had normal range of motion of all joints and no weakness in the lower extremities, normal gait and station and no coordination/cerebellum abnormalities. However, I have accommodated the claimant's left shoulder complaints and her complaints of CTS symptoms in the right hand and wrist as noted above with the limitation to performing only frequent handling bilaterally. Additionally, the limitation of only occasionally climbing stairs and performing no kneeling or crawling accounts for her allegations of pain and weakness in the lower extremities.

The claimant has complained of chronic back pain; however, the evidence does not corroborate her statements to the degree alleged. For example, her treatment providers recommended she take over the counter NSAIDs for pain, but she reported that she had not tried any in January 2011 and November 2011. While she rated her back pain a 10/10 during the consultative exam with Dr. Ozment on July 27, 2013, she rated her pain a 2/10 twice in April 2013, a 0/10 on July 30, 2013, a 6/10 in November 2013 and a 1/10 in August 2014. When she saw Dr. Bond on November 22, 2013, she described her lower back pain as "intermittent." She has been prescribed Mobic and Naproxen for pain, as well as Flexeril, Tramadol and Robaxin at various times to take *as needed* for pain and muscle spasms. The claimant has reported that her medications help

some, but she also said her back pain is relieved by using a heating pad. She has not been prescribed narcotic medications for her pain. The claimant's treatment providers have often noted that she was in no acute distress during office visits.

The claimant is obese with a BMI of 34.3 based on her reported weight of 200 pounds and height of 5'4" at the time of filing. As indicated in SSR 02-1p, obesity may have an adverse impact on co-existing impairments and may limit an individual's ability to sustain activity on a regular and continuing basis during an 8-hour day, 5-day week or equivalent schedule. In this case, I note that the claimant's obesity has had an adverse effect on her musculoskeletal impairments, as the claimant has been counseled on the importance of losing weight to help with her back pain by several providers. Nevertheless, there is no indication that obesity exacerbates the claimant's conditions beyond the extent discussed above or is otherwise disabling. Therefore, I have accounted for any effects of obesity on the claimant's other impairments in limiting the claimant to a reduced range of light work.

The claimant has depression, which results in the limitation on her ability to have only occasional contact with the public. As noted above, the claimant was prescribed Zoloft and Vistaril to take as needed for anxiety complaints by her regular medical providers. On January 19, 2011, the claimant said she is unable to work, so she stays in her house most of the day and this was causing her to be depressed. She also said she had a lot of anxiety. The claimant's Zoloft was increased due to her anxiety and depressive symptoms. Some of her providers previously mentioned that they may refer her to mental health once her thyroid condition was stabilized if her depression with anxiety symptoms persisted. However, on April 16, 2013, the claimant reported that she had no prior formal mental health treatment. The claimant did not present to Altapointe for treatment with a mental health care specialist until October 2013; and at that time, it was noted she was referred by her attorney. There were also visits w[h]ere she specifically noted no mental health complaints. For example, on January 4, 2013, Dr. Kakazu noted the claimant did not report feeling down, depressed or hopeless and did not report little interest or pleasure in doing things. On April 30, 2013, she was started on Zoloft when she admitted to increased anxiety/depression for 2 years and increased insomnia. However, during the consultative exam with Dr. Ozment on July 27, 2013, she did not report that she was taking Zoloft.

The claimant underwent a consultative psychological exam with Pamela M. Starkey, Psy.D. on June 20, 2013. She reported that the depression and anxiety initially began about 3-4 years ago, before she came to the United States in 2009. She reported stressors at the onset of her problems, including 2 deaths in the family, the end of an apparently

intimate relationship, and her children moved to the United States. She reported that she has the anxiety symptoms when she has to wait to do something (e.g., in a line) or when she has an appointment. She said sleep was adequate with medication.

The claimant said she has never been in counseling, but she was prescribed Zoloft and Vistaril. However, she said the medication does not help her. The claimant told Dr. Starkey that she has the equivalent of a bachelor's degree in the United States "in secretary." She reported she received her degree in Puerto Rico from "The Eastern University." The claimant reported that she worked at "The Judiciary Center" in Fajardo, Puerto Rico from 2004 to 2010. Dr. Starkey said the claimant's overall employment history has been relatively stable. The claimant said she has not worked since 2010 due to "a lot of back pain." The claimant said she lives with her 2 children and a grandson. She has problems dressing (pants) because of problems bending but she has no problems bathing or making something simple to eat. She does not grocery shop because her back hurts if she pushes the cart. She can wash small dishes. She reported problems with doing laundry due to having to bend and said she cannot drive because of her back. The claimant reported that her back hurts "all the time." Dr. Starkey said the claimant appeared early for the evaluation and was of average height and moderately overweight. Her appearance was good.

The claimant's speech was generally clear and coherent, and of appropriate rate and volume. Her reported mood was sad and her affect was dysphoric. Dr. Starkey said she was tearful at various times. The claimant was alert and oriented to person, place, and time for the evaluation. Overall, she was able to focus and sustain attention. The claimant had adequate performance in terms of attention/concentration during specific mental status tasks. She completed the first several subtractions of serial 3s without error and accurately spelled "WORLD" ("MUNDO" in Spanish) backwards. The claimant's immediate memory appeared impaired, which Dr. Starkey said seemed to be due to anxiety and reported concentration problems. The claimant's thinking was organized. There was no evidence of delusional thought processes or paranoia, auditory/visual hallucinations, or any other psychotic symptom. The claimant's insight into her current problems appeared fair and her judgment was adequate regarding future plans and any awarded benefits. Intellectual functioning was estimated to be Average.

Dr. Starkey assessed the claimant with mood disorder due to hyperthyroidism versus major depressive disorder, single episode; anxiety disorder due to hyperthyroidism versus anxiety disorder, NOS; and pain disorder associated with psychological factors versus pain disorder associated with psychological factors and a general medical condition. Dr.

Starkey opined that the claimant's ability to understand simple, concrete instructions appears adequate. Her ability to remember and carry out simple, concrete instructions appears at least mildly impaired. Her ability to respond appropriately to supervision and coworkers appears adequate. Her ability to manage common work pressures appears moderately impaired.

The claimant underwent an initial psychiatric evaluation at Altapointe with Severin Grenoble, M.D., on October 9, 2013. Dr. Grenoble said the claimant was referred to Altapointe "by the lawyer who is working on her disability case." The claimant reported severe depression with daily crying spells, trouble sleeping, and lack of energy and motivation. The claimant also reported she had a lot of stress, as her father was ill, lack of income, and she felt she was a burden on her daughter and her family. The claimant said these stressors were "piling up" and she does not know how to cope with them. The claimant said, "I was a very happy person but things started happening." The claimant told Dr. Grenoble that the Zoloft and Vistaril prescribed from the health department were helpful at first, but they were no longer helping. She denied any side effects. Her recreational/leisure activities include[ed] reading, watching television and spending time with her grandson. On mental status exam, her general appearance was appropriate. Her behavior was normal and cooperative. Her mood was sad and affect was appropriate. Moderate anxiety was noted. Her appetite was fair and sleep was poor with difficulty falling asleep. Her memory was unimpaired, but she had anxiety-type racing thoughts and impaired concentration. Her judgment and insight were good. Dr. Grenoble diagnosed the claimant with major depressive disorder, recurrent, moderate; and generalized anxiety disorder. Her Zoloft and Vistaril dosages were increased and she was given Trazodone to take as needed for insomnia.

The claimant saw John Hayes, CRNP at Altapointe on November 6, 2013 for medication management. She reported that she felt like her heart was racing when she took Zoloft at the increased dosage, so this medication was discontinued and replaced with Paxil. She endorsed auditory hallucinations described as "footsteps and feels like someone sits next to her." Her concentration was unimpaired, and Mr. Hayes said she did not present as depressed. She had full affect and smiled appropriately. Mild anxiety was noted. On December 18, 2013, the claimant saw Sheri Lazenby, CRNP, and again reported that she hears her name being called by her grandchild on occasion, but she said this was "not too distressing." She said her sleep and appetite were good, but she had some continued depression. Her Paxil dosage was increased. No medication side effects were reported.

The claimant saw Lauren Turnbow, M.D. at Altapointe on March 7, 2014. Dr. Turnbow noted the claimant was confused over her medications, as she was getting medications from both Altapointe and the health department. The claimant reported medications helped for depression, anxiety and sleep when she took them. However, she had not taken her Paxil and Trazadone for the past 2 weeks due to 1 day of nausea and vomiting. She reported increased anxiety, difficulty sleeping, depressed mood as a result. Dr. Turnbow noted the claimant "was observed smiling and laughing on [her] cell phone in [the] lobby waiting areas when called back to [the] physician's office." Dr. Turnbow discontinued the Trazadone, as she has other medications for sleep and mood. The claimant said Paxil was more effective than Zoloft, so this medication was restarted. Vistaril was continued as prescribed. Dr. Turnbow said the claimant "appears stable with minimal mood instability." Her appetite was stable and sleep was good. The claimant had normal memory, attention and concentration.

The claimant saw Mr. Hayes at Altapointe on July 28, 2014 and her mental status exam findings were again improved. Her mood was normal and affect was euthymic with normal range. She had no auditory or visual hallucinations. Her memory was intact and attention and concentration appeared intact. Her Paxil and Vistaril were refilled as previously prescribed.

Despite the claimant's allegations that she suffers from depression with anxiety, the evidence reflects that her level of mental functioning is only moderately impaired by her mental health symptomatology. The record reflects that the claimant did not seek formal mental health treatment for her depression until October 2013, when she was referred by her attorney. She had only been prescribed medications by her general treating physicians prior to that time.

I have accounted for the claimant's complaints of symptoms related to depression[,] including crying spells, mood swings, anxiety and insomnia, etc. that have improved with more recent treatment at Altapointe, with the limitation to having only occasional contact with the public. This limitation is supported by her testimony that she had no social life until only recently when she started going to church. She said she did not know many people and did not have enthusiasm to get to know people until recently. No greater limitation is necessary, as the claimant said she spends time with her father and grandson daily and communicates with others via telephone and the computer. The claimant also told Dr. Starkey that she only has the anxiety symptoms when she has to wait in line to do something or when she has an appointment. Additionally, the claimant has reported the medications were helpful when taken as prescribed, as noted by Dr. Turnbow in March 2014; and her mental status exam was normal in July 2014.

As for the opinion evidence, Dr. Starkey opined that the claimant's ability to understand simple, concrete instructions appears adequate. However, her ability to remember and carry out simple, concrete instructions appeared at least mildly impaired. She said the claimant's ability to respond appropriately to supervision and coworkers appears adequate, but her ability to manage common work pressures appeared moderated impaired.

I give Dr. Starkey's opinion . . . some weight, as the most significant limitation assigned was a moderate limitation in the ability to manage common work pressures. I accounted for this with the limitation to having only occasional contact with the public. This limitation is also consistent with Dr. Starkey's finding that the claimant's ability to respond appropriately to supervision and coworkers was adequate. However, I do not give significant weight to Dr. Starkey's statement that the claimant's ability to remember and carry out instructions appears at least mildly impaired because the evidence, including Dr. Starkey's own narrative report, does not support any limitation in this area. For example, the claimant told Dr. Starkey that she quit her prior employment primarily due to physical complaints and has not worked since 2010 due to "a lot of back pain." Similarly, the claimant told her treatment providers at Altapointe that she stopped working in 2010 due to back pain. The claimant has also reported that she was never terminated from past employment and she reported that she enjoys reading often. Dr. Starkey said the claimant's memory "appeared impaired," but this was attributed to anxiety and the claimant's "reported concentration problems." However, her recent and remote memory were not impaired, and Dr. Starkey said her attention and concentration were adequate on mental status exam. Dr. Starkey also estimated that the claimant has Average intelligence. The claimant has a bachelor's degree. The Altapointe records reflect unimpaired attention, concentration and memory once her medications were adjusted and taken as prescribed. Therefore, no limitations on the claimant's ability to remember and carry out instructions are warranted.

I give some weight to the findings and opinion of Donald E. Hinton, Ph.D. in Exhibits B3A and B4A. On June 26, 2013, Dr. Hinton completed a Psychiatric Review Technique Form (PRTF) and found that the claimant had the following limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. In the Mental Residual Functional Capacity (MRFC) Assessment, Dr. Hinton opined that the claimant has the ability to understand, remember and carry out very short and simple instructions; can attend for 2-hour periods; should have infrequent contact with the general public; and changes in work setting should be minimal.

Like Dr. Hinton, I assigned a moderate limitation in social functioning, as the claimant testified that she used to drive and socialize when she lived in Puerto Rico. However, she said her only socialization outside of her family currently is going to church. The claimant said she started going to church a few months ago and had no social life before that because she did not know a lot of people and did not have enthusiasm to get to know people. Similar to Dr. Hinton in the MRFC, I found that the claimant should only have occasional contact with the public. However, no additional limitations are necessary, as the claimant's symptoms have improved with more recent treatment at Altapointe. The claimant also said she spends time with her father and grandson daily and communicates with others via telephone and the computer.

However, unlike Dr. Hinton, I assigned a mild limitation in concentration, persistence or pace because the claimant has reported that she can manage finances and reported no difficulty with memory, completing tasks, concentration, understanding or following instructions. Additionally, no significant attention/concentration deficits were noted by Dr. Starkey in Exhibit B4F. The more recent treatment notes indicate no abnormalities in attention, concentration and memory. The claimant also testified that she has a bachelor's degree and she was able to obtain a Louisiana driver's license. Therefore, I give no significant weight to Dr. Hinton's findings in the MRFC with regard to handling only very short and simple instructions.

With regard to the claimant's physical limitations, I give some weight to Dr. Ozment's findings and opinion in Exhibit B5F, to the extent it is consistent with and supported by the overall evidence of record. Dr. Ozment assigned the following limitations, which he attributed to low back pain: He said the claimant can stand for up to 4 hours and walk for less than 2 hours; climb steps and stairs occasionally; climb ladders occasionally; and never climb scaffolds and ropes. Dr. Ozment also said the claimant should never stoop, crouch, kneel or crawl, noting "She could do none of those maneuvers at the time of this exam due to low back pain." Dr. Ozment said unprotected heights would be limited due to her back pain and she is "not used to unprotected  heights." Dr. Ozment said the claimant could lift 10 to 20 pounds occasionally and 5 to 10 pounds frequently, noting justification for this limitation would be mostly on the left because she had decreased range of motion of the left shoulder. Dr. Ozment also said the claimant can sit for up to 6 hours, assigned no limitations in terms of gross/fine manipulative activities, hearing, speaking and traveling.

The record does not support a finding that the claimant can stand only 4 hours or that she can never stoop. Dr. Ozment assigned these limitations due to low back pain. However, Dr. Ozment noted the functional limitations were based on both subjective and objective findings. I note the

claimant's chief complaint during the consultative exam with Dr. Ozment was low back pain, which she rated a 10/10. However, she only rated her low back pain between a 1/10 and a 6/10 to her treatment providers. There were also instances when she rated her pain a 0/10. Therefore, the pain complaints presented to Dr. Ozment are not consistent with the statements given to her treatment providers. She also initially told Dr. Ozment that she does not do her housework because of back pain, but she later stated that she helps her daughter with light housework. As stated previously, most of the physical exams of record reflected normal range of motion, no CVA tenderness, no muscle spasm, no lower extremity weakness, and she had a negative SLR bilaterally on multiple visits. The neurologic exams have shown no focal deficits, no sensory abnormalities and no motor dysfunction that would support the limitations assigned by Dr. Ozment. Dr. Ozment also said she was poorly coordinated due to left back pain. However, the other records reflect that she has generally had normal range of motion, no weakness in the lower extremities, normal gait and station and no coordination/cerebellum abnormalities.

Additionally, although Dr. Ozment said the limitations assigned with regard to lifting and carrying were "mostly on the left" and due to decreased range of motion in that shoulder, I included similar limitations in the residual functional capacity to account for the x-rays of her spine showing degenerative disc disease and the physical exams as described above. I also limited the claimant to performing only frequent handling bilaterally, occasionally climbing stairs, and no kneeling or crawling due to the findings related to her left shoulder, her CTS complaints, and her obesity.

.    .    .

**6.     The claimant is capable of performing past relevant work as an administrative clerk [and a human resources clerk]. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

At the hearing, the vocational expert was asked to classify the claimant's past work by skill and exertional level. She responded that the claimant had worked as a human resource clerk (DOT 209.362-026), a sedentary, semiskilled job with an SVP of 4 and administrative clerk (DOT 219.362-010), a light, semi-skilled job with an SVP of 4.

The claimant reported that she worked 40 hours a week as a project worker/secretary for a Head Start Program in Puerto Rico from approximately 1993 to 2004, earning $8.75 per hour. She also said she worked 40 hours a week as a clerical worker/secretary at the courthouse

from 2004 to either April 2010 or January 2011, earning $12.00 per hour. The claimant's earnings records reflect SGA level earnings during the last 15 years while the claimant was employed at both of these jobs. The claimant also performed these jobs for long enough such that she learned the jobs. Therefore the work meets the definition of past relevant work.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually performed. The vocational expert testified that the claimant's past work as an administrative clerk and human resources clerk requires only frequent handling. Therefore, these occupations are consistent with the limitations assigned in the residual functional capacity.

Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

The claimant's representative also asked the vocational expert whether a hypothetical individual could perform the claimant's past work if, in addition to the limitations assigned in the residual functional capacity above, the individual would have limitations consistent with those assigned by Dr. Starkey in Exhibit B4F such that the individual would be moderately impaired (defined as 1/3 to 2/3 of the workday) in terms of responding to common work pressures and mildly impaired (defined as less than 1/3 of the workday) in the ability to remember and carry out simple, concrete instructions. The vocational expert noted that the "mild" definition assigned by the representative would equate to "occasional" and the "moderate" definition would equate to "frequent" in vocationally relevant terms. The vocational expert stated that if a person can only perform simple, concrete tasks and can be expected to be unable to do so up to 1/3 of the day, this individual is limited to unskilled work. Thus, he or she cannot do the claimant's past work. Additionally, if the individual cannot manage work pressures between 1/3 and 2/3 of the day, he or she would be unable to sustain work activity even on an unskilled level. However, as discussed in detail above, significant weight was not given to these limitations as assigned by Dr. Starkey.

The claimant's representative then asked the vocational expert if an individual could perform claimant's past work with the limitations set forth by Dr. Ozment in Exhibit B5F. The vocational expert responded that the individual could perform the claimant's past work, as there are a number of light jobs that do not require standing/walking of 6 hours per day. She also said the claimant's past jobs would be consistent with these limitations as performed by the claimant.

(Tr. 42, 43-54 & 55-56 (internal citations omitted; emphasis in original)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

> to determine whether the claimant is disabled, which considers: (1)
> whether the claimant is engaged in substantial gainful activity; (2) if not,
> whether the claimant has a severe impairment; (3) if so, whether the
> severe impairment meets or equals an impairment in the Listing of
> Impairments in the regulations; (4) if not, whether the claimant has the
> RFC to perform her past relevant work; and (5) if not, whether, in light of
> the claimant's RFC, age, education and work experience, there are other
> jobs the claimant can perform.

*Watkins v. Commissioner of Social Security*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9,

2012)[2] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f);

*Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The

claimant bears the burden, at the fourth step, of proving that she is unable to perform

her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating

whether the claimant has met this burden, the examiner must consider the following four

factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining

physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.

*Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return

to h[er] past relevant work, the [Commissioner of Social Security] has an obligation to

develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987)

(citations omitted). If a plaintiff proves that she cannot do her past relevant work, it then

becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is

capable—given her age, education, and work history—of engaging in another kind of

---

[2]     "Unpublished opinions are not considered binding precedent, but they may be
cited as persuasive authority." 11th Cir.R. 36-2.

substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform her past relevant work as an administrative clerk and a human resources clerk, as she actually performed those jobs, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner'] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

---

[3]    This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

On appeal to this Court, Mercado asserts three reasons why the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ reversibly erred in finding that she can perform her past relevant work, given that she did not perform that work in the United States and, therefore, her inability to communicate in English would preclude her performance of such work; (2) the ALJ reversibly erred in failing to give adequate weight to the opinion of the consulting psychologist, Dr. Pamela Starkey; and (3) the ALJ's residual functional capacity determination is not supported by substantial evidence.

**A.** **Did the ALJ Err in Finding Plaintiff is Capable of Performing her Past Relevant Work**? Plaintiff initially contends that the ALJ reversibly erred in concluding that she could perform her past relevant work as a human resources clerk and an administrative clerk given that she has moved to the United States and does not speak, write or read in English, thereby precluding her work as it was performed and as it is generally performed in the national economy. (*See* Doc. 12, at 2-4.)

> [A]t the hearing, Plaintiff's counsel questioned the Vocational Expert as to whether the Plaintiff could perform her past work given that the Plaintiff could not read, write, or speak English. Tr. at 106. The Vocational Expert testified that the Plaintiff could perform her past work as it is performed in Puerto Rico, but the great majority of occupations in the United States would require the Plaintiff to read, write, or speak English. Tr. at 107. The Plaintiff would therefore be unable to perform her past work as it is generally required by employers in the national economy.
>
> The Plaintiff's past work as a human resource clerk and an administrative clerk was only ever performed in Puerto Rico. As a human resource clerk and administrative clerk in Puerto Rico, the Plaintiff was not required to speak or write in English. The Plaintiff has not performed her past relevant work in the United States where being fluent in English would be a requirement. In her decision, the Administrative Law Judge does not address the Vocational Expert's testimony that the Plaintiff would not be able to perform her past relevant work in the United States.

(*Id.* at 3-4.)

The undersigned finds that the ALJ committed no error in finding that Mercado can perform her past relevant work as a human resources clerk and an administrative clerk without specifically taking into account/considering the fact that Plaintiff does not speak, write or read in English because the ability to speak, read or write in English, that is, the ability to communicate in English, "is a vocational factor related to education, not an impairment[,]" *Nunez v. Commissioner of Social Security,* 2017 WL 942991, *4 (M.D. Fla. Mar. 10, 2017) and where, as here, "a claimant has the RFC to perform past work, the vocational factor of education is not considered[.]" *Id.*; *see, e.g.,* 20 C.F.R. § 404.1560(b)(3) (2016) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We ***will not consider your vocational factors of*** age, ***education***, and work experience or whether your past relevant work exists in significant numbers in the national economy." (emphasis supplied)). In other words, "the issue of Plaintiff's ability to speak, read, or write in English is not addressed in determining whether [s]he can return to work" as a human resources clerk or an administrative clerk. *Nunez, supra,* at *4, citing *Hernandez v. Astrue,* 2010 WL 5387601, *3 (M.D. Fla. Dec. 22, 2010) (stating claimant's "lack of fluency in English is not a factor to be considered in determining whether he could return to past work" and the "ability to communicate in English is an aspect of the vocational factor of education" which is not considered if the claimant has the RFC to perform his past relevant work), *aff'd,* 433 Fed.Appx. 821, 823 n.1 (11th Cir. Jul. 11, 2011) (noting that the DOT does not specify that the claimant must be able to perform the job in English). Accordingly, this Court finds that because, as will made

clear later in this opinion, the ALJ properly determined that Mercado retains the residual functional capacity to perform her past relevant work as a human resources clerk and an administrative clerk, the ALJ did not err in finding Mercado could perform that past relevant work without addressing the issue of her ability to speak, read, or write in English. *See Nunez, supra.*

B. <u>**Opinion of Consultative Examiner Dr. Pamela Starkey.**</u> Mercado contends that the ALJ reversibly erred in not assigning significant weight to the opinion of consultative examiner Dr. Pamela Starkey that Plaintiff would have at least mild limitations in her ability to remember and carry out simple, concrete instructions. (*See* Doc. 12, at 4-7.) According to Mercado, Dr. Starkey's opinion in this regard is entitled to controlling weight because it "is not internally [in]consistent nor is it inconsistent with the opinion of Plaintiff's treating doctors or State agency reviewing psychiatrist, Dr. Hinton." (*Id.* at 7.)

There can be little question but that "[w]eighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the process for determining disability." *Kahle v. Commissioner of Social Security,* 845 F.Supp.2d 1262, 1271 (M.D. Fla. 2012). In general, "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Security Administration,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). In assessing the medical evidence, "[t]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor[,]"

*Romeo v. Commissioner of Social Security,* 2017 WL 1430964, *1 (11th Cir. Apr. 24, 2017) (citing *Winschel v. Commissioner of Social Security,* 631 F.3d 1176, 1179 (11th Cir. 2011)), and the ALJ's stated reasons must be legitimate and supported by the record, *see Tavarez v. Commissioner of Social Security,* 638 Fed.Appx. 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

In this case, the ALJ certainly stated with particularity the weight she was affording Dr. Starkey's various opinions and the reasons therefor. For instance, the ALJ accorded "some" weight to Dr. Starkey's opinion that Mercado would have a moderate limitation in the ability to manage common work pressures and accounted for that limitation by finding, in the RFC determination, that Plaintiff can have only occasional contact with the public (Tr. 52). In addition, and importantly, the ALJ declined to give "significant weight to Dr. Starkey's statement that the claimant's ability to remember and carry out [simple, concrete] instructions appears at least mildly impaired[.]" (*Id.*) The ALJ then explained her reasons for failing to accord significant weight to this limitation, as follows:

> [T]he evidence, including Dr. Starkey's own narrative report, does not support any limitation in this area. For example, the claimant told Dr. Starkey that she quit her employment primarily due to physical complaints and has not worked since 2010 due to "a lot of back pain." Similarly, the claimant told her treatment providers at Altapointe that she stopped working in 2010 due to back pain. The claimant has also reported that she was never terminated from past employment and she reported that she enjoys reading often. Dr. Starkey said the claimant's memory "appeared impaired," but this was attributed to anxiety and the claimant's "reported concentration problems." However, her recent and remote memory were not impaired, and Dr. Starkey said her attention and concentration were adequate on mental status exam. Dr. Starkey also estimated that the claimant has Average intelligence. The claimant has a bachelor's degree. The Altapointe records reflect unimpaired attention, concentration and

memory once her medications were adjusted and taken as prescribed. Therefore, no limitations on the claimant's ability to remember and carry out instructions are warranted.

(*Id.* at 52-53.)

The Court finds that the reasons offered by the ALJ for failing to accord significant weight to Dr. Starkey's "remember and carry out" limitation—essentially internal inconsistency and inconsistent with the remaining evidence of record—are legitimate and supported by the record. This Court simply cannot argue with the ALJ's reasoning that this limitation by Starkey is inconsistent with (that is, very much in tension with) the consultative psychologist's objective findings that the claimant had adequate performance in terms of attention/concentration during specific mental status tasks and in regards to recent and remote memory functions, with her impairment in immediate memory being attributed to her anxiety and reported concentration problems (*compare id. with* Tr. 427). In other words, the undersigned cannot find anything "erroneous" about the ALJ finding Dr. Starkey's noted "mild" limitation in Mercado's ability to "remember, and carry out simple, concrete instructions" to be inconsistent with the Plaintiff's noted adequate ability to remember (upon request/instruction) what she ate for dinner the previous evening, a current news event, and to report her birthdate and other autobiographical information, as well as her ability to complete the first several subtractions of serial 3s without error and accurately spelling WORLD (MUNDO in Spanish) backwards (*see* Tr. 427). In addition, the ALJ properly afforded this limitation no significant weight in light of the remaining evidence of record, which, as the ALJ noted, "reflect unimpaired attention, concentration and memory once her medications were adjusted and taken as prescribed." (Tr. 53.) Indeed, the records from

Altapointe post-dating Dr. Starkey's June 21, 2013 evaluation (*see* Tr. 428 (report signed on June 21, 2013)) reflect the following: (1) on November 6, 2013, Mercado's memory was unimpaired and no impairment in concentration was noted (Tr. 441); (2) on December 18, 2013, Mercado's memory was unimpaired and no impairment in concentration was noted (Tr. 439); (3) on March 7, 2014, Plaintiff's attention and concentration were intact and her immediate/short term, recent and remote memory appeared to be intact (Tr. 445); and (4) on July 28, 2014, Mercado's attention and concentration were intact and her immediate/short term, recent and remote memory appeared to be intact (Tr. 448). Based upon the foregoing evidence, the undersigned finds substantial support for the ALJ's determination that "no limitations on the claimant's ability to remember and carry out instructions are warranted." (Tr. 53.)

C.    **Does Mercado Retain the Residual Functional Capacity to Perform a Limited Range of Light Work**?    The Plaintiff's final assignment of error is that the ALJ's RFC determination for a limited range of light work is not supported by substantial inasmuch as the ALJ cherry-picked from the limitations noted by Dr. Ozment and substituted her opinion for that of Dr. Ozment when Dr. Ozment's opinion was not consistent with her own determination of RFC. (*See* Doc. 12, at 7-9.)

The responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's

remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins v. Commissioner of Social Security,* 457 Fed. Appx. 868, 870 n.5 (11th Cir. Feb. 9, 2012) (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)); *see also* 20 C.F.R. § 404.1545(a)(3) (in assessing RFC, the Commissioner is required to consider "descriptions and observations of [the claimant's] limitations from [] impairments, including limitations that result from [] symptoms, such as pain, provided by [the claimant] . . . .").

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue,* 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory,

and other requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013); *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[4] However, in order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner

---

[4] It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue*, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ *could have* relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003).

In this case, the Court finds that the ALJ linked her RFC assessment—that is, a reduced range of light work—to specific evidence in the record bearing upon Mercado's ability to perform the physical, mental, sensory and other requirements of work. (*Compare* Tr. 43-44, 47-49 & 52-54 *with generally* Tr. 322-474.) In particular, even though the Plaintiff is correct that the ALJ did not "endorse" all the physical limitations noted by Dr. Ozment (during the course of his July 27, 2013 examination), particularly the consultative examiner's opinion that Mercado can only stand 4 hours out of a 8-hour workday and cannot stoop due to low back pain and that she was poorly coordinated (*see* Tr. 432-34; *compare id. with* Tr. 53-54 & 54), the ALJ set forth reasons for rejecting these particular limitations (Tr. 54).

> The record does not support a finding that the claimant can stand only 4 hours or that she can never stoop. Dr. Ozment assigned these limitations due to low back pain. However, Dr. Ozment noted the functional limitations were based on both subjective and objective findings. I note the claimant's chief complaint during the consultative exam with Dr. Ozment was low back pain, which she rated a 10/10. However, she only rated her low back pain between a 1/10 and a 6/10 to her treatment providers. There were also instances when she rated her pain a 0/10. Therefore, the pain complaints presented to Dr. Ozment are not consistent with the statements given to her treatment providers. She also initially told Dr. Ozment that she does not do her housework because of back pain, but she later stated that she helps her daughter with light housework. As stated previously, most of the physical exams of record reflected normal range of motion, no CVA tenderness, no muscle spasm, no lower extremity weakness, and she had a negative SLR bilaterally on multiple visits. The neurologic exams have shown no focal deficits, no sensory

> abnormalities and no motor dysfunction that would support the limitations assigned by Dr. Ozment. Dr. Ozment also said she was poorly coordinated due to left back pain. However, the other records reflect that she has generally had normal range of motion, no weakness in the lower extremities, normal gait and station and no coordination/cerebellum abnormalities.

(*Id.*)

The undersigned finds that the ALJ was absolutely correct in observing that the foregoing limitations are traceable to both subjective and objective findings and properly rejected those limitations given that Plaintiff's pain complaints to Dr. Ozment were not consistent with the pain statements Mercado made to her treating doctors. Indeed, Mercado complained to Ozment, on July 27, 2013, that her low back pain was a 10 on a scale of 1 to 10 (*see* Tr. 430), a level that was never reached by Plaintiff at any time before or after July 27, 2013 (*compare, e.g.,* Tr. 401-03 (on September 7, 2012, Mercado complained of back pain, was tender to palpation over the lower spine, and had positive straight-leg raising test bilaterally; she was told to maintain regular exercise); Tr. 405-06 (on June 1, 2012, when Mercado appeared for follow-up regarding her back pain, it was noted that she was in no acute distress, with negative straight leg raising bilaterally and normal range of motion of the lumbar spine); Tr. 411-12 (on April 30, 2013, Mercado was noted to be in no acute distress, despite complaints of back pain, with examination of the musculoskeletal system being normal and pain rated at 2 on a scale of 0-10); Tr. 413 & 415 (on April 16, 2013, examination of the back revealed tenderness on palpation and muscle spasms, but plaintiff was noted to be in no acute distress, with a pain level of 2 on a scale of 0-10) *with* Tr. 467-68 (on July 30, 2013, a mere 3 days after Ozment's examination, Mercado was found, on physical examination, to be in no acute distress and her pain level was a "0"); Tr. 462-63 (on November 22,

2013, though Plaintiff complained of back pain of "6," she was noted to be in no acute distress and examination of her musculoskeletal system was normal); Tr. 460-61 (on April 2, 2014, Mercado complained of pain but was found to be in no acute distress, with examination of the back revealing no tenderness on palpation, no muscle spasm, and no costovertebral angle tenderness); Tr. 458-59 (on July 7, 2014, despite Mercado's back pain complaints, she was found to be in no acute distress, with mostly midline tenderness on palpation of the back but no muscle spasm or costovertebral angle tenderness; Plaintiff was advised of the importance of weight loss and exercise); and Tr. 456-57 (on August 28, 2014, Mercado was noted to be in no acute distress, with a pain level of "1")). Accordingly, the undersigned finds that the ALJ properly discounted Dr. Ozment's standing and stooping limitations since they were based, at least in part if not in greater measure, on what can only be regarded as Mercado's exaggerated low back pain complaints on July 27, 2013. In addition, these limitations find no support in the x-rays of record, all of which are normal or unremarkable (*see* Tr. 352 (normal radiography of the lumbosacral spine on September 23, 2011); Tr. 436 (August 27, 2013 RAD of the lumbar spine revealed minimal degenerative changes); Tr. 473 (two views of the lumbar spine on November 22, 2013 were normal)), or the majority of physical and neurological findings of record (*compare, e.g.,* Tr. 404 (July 10, 2012 examination revealed tenderness on palpation of the back but no peripheral neuropathy, no sensory abnormalities, normal reflexes, and no dysfunction on motor examination); Tr. 406 (on June 1, 2012, a normal neurological examination was noted and an examination of the back revealed no tenderness to palpation over the spine, normal range of motion of the lumbar spine, and negative straight leg raising bilaterally); Tr. 412

(examination of the musculoskeletal system on April 30, 2013 was normal); Tr. 415 (examination of the back on April 16, 2013 revealed tenderness on palpation and muscle spasm but no costovertebral angle tenderness); Tr. 459 (examination on July 7, 2014 revealed mostly midline tenderness on palpation, no muscle spasm, no costovertebral angle tenderness, negative straight leg raising, and a motor examination which "demonstrated no dysfunction LE strength normal and equal"); Tr. 461 (on April 2, 2014, there was no tenderness on palpation of the back, no muscle spasm, and no costovertebral angle tenderness, negative straight leg raising, and a motor exam that revealed "no dysfunction No LE weakness") & Tr. 463 (on November 22, 2013, examination of the musculoskeletal system was normal, reflexes were normal, no sensory abnormalities were noted, and motor exam demonstrated no dysfunction)).[5] Accordingly, the undersigned finds no merit to Mercado's claim that the ALJ erred in rejecting certain limitations noted by Dr. Ozment and, as a result, reached an RFC assessment that is not supported by substantial evidence.[6] The ALJ's fourth-step denial of benefits is supported by substantial evidence and is due to be affirmed.

---

[5] The ALJ's rejection of Dr. Ozment's suggestion that Mercado was poorly coordinated finds substantial support in the record. (*See, e.g.,* Tr. 404 (on July 10, 2012, no coordination or cerebellum abnormalities were noted) & Tr. 463 (on November 22, 2013, no coordination or cerebellum abnormalities were noted)).

[6] Even if this Court was to find some error in this regard, it necessarily would be regarded as harmless given the vocational expert's testimony that even in light of the limitations noted by Dr. Ozment—that is, standing up to four hours, walking less than 2, no stooping, sitting up to six hours, and frequently lifting 5 to 10 pounds and occasionally lifting 10 to 20 pounds— the claimant would be capable of performing her prior work as a human resources clerk and an administrative clerk. (*See* Tr. 105-06.)

**CONCLUSION**

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 14th day of June, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**